JAMES BEGGS *vs*. JAMES HANLEY BREWING COMPANY.

PROVIDENCE—NOVEMBER 22, 1905.

PRESENT: Douglas, C. J., Blodgett, Johnson, and Parkhurst, JJ.

(1)   *Contracts.   Construction.   Warranties.*

Plaintiff entered into following agreement with defendant:   "We will furnish and place in position ready for use, exclusive of mason work, the McClave apparatus, consisting of the McClave improved twin-lever grate and the McClave Argand Blower, under each of your boilers for the sum of $766.75. The McClave system is adapted for the burning of fine anthracite fuel; workmanship and material first-class in every particular.   Should you wire us the acceptance of the above proposition we will have the apparatus shipped the latter part of this week, so that same can be installed on Sun-

day—it might be possible that part of the work would have to go over until the following Sunday, but there will be no delay in the operation of your plant."

Defendant replied: "Will accept your proposition for the McClave apparatus for our boilers according to your letter of the 25th. Ship at once":—

*Held*, that the clause relative to delay in operation of the plant applied to the work of installing the apparatus, and not to the operation of the plant after the completion of the work of installing.

*Held*, further, that the clause "adapted for the burning of fine anthracite fuel" was not a warranty that with the apparatus installed under defendant's boilers and burning fine anthracite fuel, such boilers would produce the amount of steam required for the successful operation of defendants' plant.

(2)  *Contracts.  Warranties.*

Where a known described and defined article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still if the known, defined, and described thing is actually supplied, there is no implied warranty that it shall answer the particular purpose intended by the purchaser. Nor can the purchaser rely upon statements and assertions made by the maker in circulars and advertisements concerning the article.

ASSUMPSIT, the facts being stated in the opinion. Heard on plaintiff's petition for a new trial.

JOHNSON, J.  The plaintiff delivered and installed in the defendant's brewery certain grates and blowers on the contract made by the following proposition and acceptance:

"NEW YORK, May 25, 1903.

"JAMES HANLEY BREWING CO.,
            "33 Jackson St., Providence, R. I.

"GENTLEMEN:—We have received communication from Mr. D. N. Rothermel stating that you desire a proposition for the installation of the McClave apparatus under your three boilers. We have also received communication from our Mr. Reyhner giving us definite furnace measurements, and we herewith submit you proposition for the above installation: We will furnish and place in position ready for use, exclusive of mason work, the McClave apparatus consisting of the McClave Improved twin-lever grate and the McClave Argand Blower, under each of your boilers, for the sum of $766.75. Seven Hundred Sixty-six & 75/100 Dollars net.

"The McClave system is adapted for the burning of fine anthracite fuel; workmanship and material first class in every particular.   Should you wire us the acceptance of the above proposition, we will have the apparatus shipped the latter part of this week so that same can be installed on Sunday.   We must, however, have your prompt acceptance in order to do this, and it might be possible that part of the work would have to go over until the following Sunday, but there will be no delay in the operation of your plant.   Hoping to receive your confirmation, which shall have our prompt attention, we are,

"Yours very truly,

"JAMES BEGGS & Co.,

"(signed)   Per Ellis."

"PROVIDENCE, R. I., May 26, 1903.
"To JAMES BEGGS AND Co.,

"9 Dey St., New York.

"Will accept your proposition for the McClave apparatus for our boilers according to your letter of the twenty-fifth. Ship at once.

"THE JAMES HANLEY BREWING Co."

The apparatus was put in on May 31st, June 7th, and June 14th, 1903, said dates falling on Sunday and one set being installed on each date.   Each set was used from the time it was installed, and several trials were made with fine anthracite coal, in mixtures of various proportions with soft coal.   The apparatus remained under the boilers until about October 20, 1903, when it was taken out by the defendant on the ground that the contract had not been fulfilled by the plaintiff, because with the grates and burners in use, and burning fine anthracite coal, the boilers did not produce enough steam for the successful operation of the brewery.   Suit was brought, and, jury trial being waived, the case was tried before a single justice in the Appellate Division of the Supreme Court, and a decision was rendered for the defendant.

The plaintiff petitioned for a new trial on the grounds: (1) that the decision was against the law and the evidence and the

weight thereof; (2) that the presiding justice erred in the admission of certain testimony; and (3) that he erred in certain rulings and decisions upon the construction of the contract.

The presiding justice ruled at the trial, and embodied the same ruling in his decision, that the proposition and acceptance constitute an express contract, and that, the contract thus being express, no contract is raised by implication.

This ruling was correct.

(1)    He then proceeds, however, to say: "The proposition is to furnish and place in position ready for use under each of the three boilers of a brewing plant in active operation, without delay in the operation of the plant, the McClave apparatus, consisting of the McClave Twin-lever grate and the McClave Argand Blower, adapted for the burning of fine anthracite fuel, for a certain sum of money. This fairly may be said to mean that the new grates and blowers were to displace grates already burning fuel under said boilers in the operation of the plant, and that they were to continue such operation by the burning of fine anthracite fuel for which they are adapted; and furthermore, that there will be no delay in the operation of the plant. This assumes that when the McClave system is introduced, installed, and burning fine anthracite fuel under the boilers, there will be no delay in the operation of the plant, by the proper use of such apparatus and fuel. If it does not mean that, it simply means that they will not delay the operation of the plant while they are taking out the old system and installing the new one; but what advantage would that be if the new system itself proved to be a perpetual hinderance to the successful operation of the plant?" We think this construction is erroneous. The portion of the plaintiff's proposition to which the above language of the decision applies is as follows: "Should you wire us the acceptance of the above proposition we will have the apparatus shipped the latter part of this week so that same can be installed on Sunday. We must, however, have your prompt acceptance in order to do this, and it might be possible that part of the work would have to go over until the following Sunday, but there will be no delay in the operation of your plant." This clearly applies to the work of in-

stalling the apparatus, which it is proposed shall be done on Sunday in order that the operation of the plant may not be delayed thereby.   To construe this language as applying to the operation of the plant, after the completion of the work of installing the McClave apparatus, is, in our opinion, to give to the words in question a meaning which the context forbids.

The presiding justice in his decision construed the statement in the proposition that "The McClave system is adapted for the burning of fine anthracite fuel," as follows: "I am of the opinion that the words 'adapted for the burning of fine anthracite fuel,' in the contract is a warranty that the McClave system is suitable and fit to successfully burn such fuel under such boilers.   That is, that it is capable of doing the work for which and in the place where it was installed."   He made the same ruling at the trial.   At the first glance this construction does not seem to give any added meaning to the words in question, as it may be said that if the apparatus was adapted for the burning of fine anthracite fuel, it would be so adapted wherever it might be placed.   In one sense this is true, as the apparatus could not lose its adaptability for the burning of the fuel named simply from the fact of being moved.   It might, however, be placed in such a position and subjected to such conditions as to reduce or destroy its power of operation.   It certainly might be placed under boilers where, although it did operate so as to successfully burn fine anthracite coal, the boilers might not produce a given amount of steam, to say nothing of producing the amount required for the successful operation of a brewery. If the decision in this regard does not so construe the words in question as to make the apparatus practically responsible for failure on the part of the boilers, under which it was installed, to produce the amount of steam required by the brewery, then it does not mean anything.

Under this ruling, however, the presiding justice admitted evidence tending to prove that the contract between the parties was that, with the McClave apparatus installed under the boilers in the defendant's brewery, and burning fine anthracite fuel, such boilers would produce the amount of steam required for the successful operation of the brewery.

James Hanley, a witness for the defendant, referring to an interview with George Ellis, general manager of plaintiff, testified: "Q. 25. I will ask you if, as a matter of fact, Mr. Hanley, you didn't communicate to him a knowledge of the horse power of your then boilers; did you not communicate that fact? A. I did. Q. 26. Did you not also inform him that the demands of your business at the brewery demanded all of the steam that you were then producing?. A. I did. Q. 27. Did you make any statement to him that you were unwilling to change the grates that you were then using unless you were assured that the same results by the grate and blowers he proposed to sell you would produce a similar result? A. I did." He further testified: "Q. 58. Was there any reason for you not to continue the McClave system except for its incapacity to continue the results you anticipated? A. No, sir."

The prospectus of the plaintiff was also admitted in evidence.

(2)    The admission of this line of testimony illustrates the construction given to the words in question by the presiding justice more clearly than the language of the decision.

The admission of this testimony appears to rest upon the rule that where a manufacturer or dealer contracts to supply an article which he manufactures or produces, or in which he deals, so that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, there is in that case an implied warranty that it shall be reasonably fit for the purpose to which it is to be applied.

The apparatus contracted for in this case, however, was shown by the evidence, without contradiction, to be well known, and in use in other places. It was defined and described in the contract. And it is the rule that where a known, described and defined article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still if the known, defined, and described thing be actually supplied, there is no implied warranty that it shall answer the particular purpose intended by the purchaser. Benj. on Sales, § 657; I Parsons on Contracts, 589; *Chanter* v. *Hopkins*, 4 M. & W. 399; *Seitz* v. *Brewer's Refrigerating Ma-*

*chine Co.*, 141 U. S. 510; *Grand Avenue Hotel Co.* v. *Wharton,* 79 Fed. Rep. 43.

In Parsons on Contracts, *supra,* the rule is stated as follows: "If a thing be ordered of the manufacturer for a special purpose, and it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose. This principle has been carried very far. It must, however, be limited to cases where a thing is ordered for a special purpose, and not applied to those where a special thing is ordered although this be intended for a special purpose. For if the thing is itself specifically selected, and ordered, then the purchaser takes upon himself the risk of its effecting its purpose. Nor can he rely upon statements and *assertions* made by the maker in circulars and advertisements concerning the article, as a warranty that it will do what is stated."

In *Chanter* v. *Hopkins, supra,* which is a leading case on the subject, the defendant wrote to the plaintiff, the patentee of an invention known as " Chanter's smoke-consuming furnace," the following order: "Send me your patent hopper and apparatus, to fit up my brewing copper with your smoke-consuming furnace. Patent right 15 *l.* 15 *s.*, ironwork not to exceed 5 *l.* 5 *s*; engineer's time fixing 7 *s.* 6 *d.* per day." The plaintiff accordingly put up on the defendant's premises one of his patent furnaces, but it was found not to be of any use for the purposes of the brewery and was returned to the plaintiff. It was held (no fraud being imputed to the plaintiff), that there was not an implied warranty on his part that the furnace supplied should be fit for the purposes of the brewery; but that, the defendant having defined by the order the particular machine to be supplied, the plaintiff performed his part of the contract by supplying that machine.

The construction given to the words "adapted for the burning of fine anthracite fuel," was erroneous, and it follows that the line of testimony admitted under that construction was erroneously admitted.

The plaintiff took numerous exceptions to the admission of this testimony, but, as they were only pressed generally, it is not necessary to consider them in detail.

It is not disputed that the apparatus was the identical thing ordered, and was first-class in workmanship and material.

There remains for consideration the question of fact: Was the McClave apparatus adapted for the burning of fine anthracite fuel, as stated in the contract?

The evidence showed that the McClave apparatus had been on the market for several years prior to the making of this contract, and that it was in use in several plants in Providence, one in Phillipsdale, and one in Worcester, Massachusetts; that there were six sets at the Nicholson File Company, on which fine anthracite coal was burned exclusively for three or four weeks, and afterwards mixtures of said coal with soft coal were used because such mixtures were found to be more economical and produced more steam; that there were eight sets at the Glenlyon Dye Works, on which number 3 buckwheat coal was used, and that the apparatus was satisfactory. Alexander Ogg, a machinist there, testified: "Q. 12. Has the work been satisfactory that you obtain in the use of those grates and blowers, the time when you refer to when you were using this fine anthracite coal? A. It is satisfactory to us. When we started in with one, then went to three, then to five, and then to eight. That suited us." It appeared in evidence that, at these works, the Argand Blower was removed about eight months after it was put in and a system of exhausting from the dye-house substituted for it. Mr. Ogg testifies in regard to the change: "C. Q. 20. Why did you substitute this system you speak of for the McClave Argand Blower? A. There was a double object. These fans had to blow to exhaust the steam and the only place to put it was under the boiler, and we didn't want to use the live steam for that purpose."

It was shown that the apparatus was started at the pumping station at the Hope reservoir in Providence, June 22, 1903, and was tried first with number 3 buckwheat, then with number 2 and number 3 and a little pea coal, and finally used with number 2 buckwheat exclusively.

Witnesses, both for the plaintiff and defendant, testified that fine anthracite coal mixed in various proportions with soft coal was used with the apparatus in defendant's brewery;

and that fair steam was maintained in the morning in each case, but that it receded in the afternoon. The load at the brewery was shown to be very uneven. The evidence for the defendant showed that there was a particularly heavy draft on the steam when the brewer was boiling his beer.

Warren B. Lewis, an expert witness for the defendant, testified that he had made tests of the McClave apparatus in the Manufacturers' Building in Providence. On the question of the adaptability of the apparatus, he testified: "Q. 21. I will ask you whether the McClave system as installed and operated in the Manufacturers' Building is adapted to burn fine anthracite coal? A. Any grate will burn coal, any grate might burn fine anthracite coal: I should say that question would be limited entirely by the conditions imposed."

As to the conditions in defendant's brewery, the same witness testified: "Q. 49. What were the conditions existing at the Hanley brewery which militated against the adaptability of the McClave system to this plant? A. What condition did I ever find? Q. Yes. A. Why, I found on a test made there that the maximum demand upon the boilers was about 430 horse power, the boilers being rated at 320, and that would be, in my mind, a sufficient reason for saying that a steam blower could not maintain a high enough air pressure in the air pit to consume sufficient anthracite coal to give any such overload of capacity in the boiler." He further testified: "C. Q. 87. Suppose that the James Hanley brewing plant commenced in the morning with a certain variety of coal, fine anthracite coal for instance, and was operated right through until say one or two o'clock in the afternoon, with a pressure of 80 or 85 pounds, from six in the morning until two in the afternoon, and then suddenly, within a few minutes, it dropped to 40 pounds, how would you explain that? A. If the violent pressure (*depression?*) was very sudden, I should think first that it was a sudden draft of steam from the boiler that caused it."

The testimony of the defendant's witnesses that, with the apparatus in use and burning mixtures of fine anthracite and soft coal, the boilers in the defendant's brewery did not maintain sufficient steam to meet all the demands of the brewery,

does not militate against the adaptability of the apparatus for the burning of fine anthracite fuel.

The defendant did not exact a warranty that, with the apparatus in use under the boilers at its brewery, the boilers would produce sufficient steam for the operation of the brewery.

That the apparatus was adapted for the burning of fine anthracite fuel is shown, not simply by a preponderance of the evidence, but without contradiction.   In fact the evidence for the plaintiff on this question is corroborated by that introduced by the defendant.   There was no testimony in the case that the combustion of coal in the apparatus was imperfect.

The decision was against the law and the evidence.

Petition for new trial granted.   Case remitted to the Superior Court for further proceedings.

*Cooke & Angell,* for plaintiff.

*Gorman, Egan & Gorman,* for defendant.